800 A.2d 111

IN THE MATTER OF STEVEN M. KRAMER, AN ATTORNEY AT LAW (ATTORNEY NO. 033121982)

June 25, 2002.

## ORDER

The Disciplinary Review Board having filed a decision with the Court in DRB 01–038, recommending the disbarment of STEVEN M. KRAMER of BEVERLY HILLS, CALIFORNIA, who was admitted to the bar of this State in 1983, and who thereafter was

suspended from the practice of law by Order of the Court filed on April 24, 1997, and who remains suspended at this time;

And the matter having been before the Disciplinary Review Board both as a recommendation for discipline filed by a special master based on unethical conduct within New Jersey and as an application by the Office of Attorney Ethics for reciprocal discipline based on respondent's disbarment in New York;

And the Disciplinary Review Board having determined that by his conduct respondent violated *RPC* 3.2 (failure to expedite litigation), *RPC* 5.5(a) (practicing law while suspended), *RPC* 8.1(b) (failure to cooperate with disciplinary authorities), *RPC* 8.4(a) (violating or attempting to violate the Rules of Professional Conduct through the acts of another), *RPC* 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation), *RPC* 8.4(d) (conduct prejudicial to the administration of justice), and *Rule* 1:20–20(willful and substantial failure to comply with the rules and guidelines governing suspended or disbarred attorneys), and further that respondent's conduct in violating *RPC* 3.2 and *Rule* 1:20–20 constituted contempt of court as provided by *Rule* 1:20–20(b)(15) (incorrectly cited below as *Rule* 1:20–20(b)(14));

And the Disciplinary Review Board further having concluded that reciprocal discipline should be imposed and having found no reason to depart from the discipline of disbarment imposed in New York;

And **STEVEN M. KRAMER** having been ordered to show cause why he should not be disbarred or otherwise disciplined;

And good cause appearing;

It is ORDERED that the decision and recommendation of the Disciplinary Review Board are adopted and **STEVEN M. KRAMER** is hereby disbarred, effective immediately, substantially for the reasons stated by the Disciplinary Review Board in its decision; and it is further

ORDERED that respondent's name be stricken from the roll of attorneys of this State; and it is further

ORDERED that **STEVEN M. KRAMER** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by **STEVEN M. KRAMER** pursuant to *Rule* 1:21–6 shall be restrained from disbursement except on application to this Court for good cause shown and shall be transferred by the financial institution to the Clerk of the Superior Court, who is directed to deposit the funds in the Superior Court Trust Fund pending the further Order of this Court; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.

## APPENDIX

## DECISION AND RECOMMENDATION OF THE DISCIPLINARY REVIEW BOARD

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before us based on a recommendation for discipline filed by Special Master David H. Dugan, III. The five-count amended complaint charged respondent with failure to expedite litigation, in violation of *RPC* 3.2; failure to cooperate with disciplinary authorities, in violation of *RPC* 8.1(b) and *R.* 1:20–3(g)(3); failure to comply with the rules governing suspended attorneys, in violation of *R.* 1:20–20; contempt to court, by violating *R.* 1:20–20(b)(14); violation of the *Rules of Professional Conduct*, in violation of *RPC* 8.4(a); commission of a criminal act that reflects adversely on his honesty, trustworthiness or fitness as a

lawyer, in violation of *RPC* 8.4(b); conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of *RPC* 8.4(c); and conduct prejudicial to the administration of justice, in violation of *RPC* 8.4(d). The complaint also alleged that respondent was disbarred in the State of New York. It requested the imposition of reciprocal discipline, pursuant to *R.* 1:20–14.

Respondent was admitted to the New Jersey bar in 1983. In 1993 he was publicly reprimanded for gross neglect, lack of diligence, failure to withdraw as counsel when discharged, failure to protect a client's interests after termination of the representation and failure to cooperate with disciplinary authorities. *In re Kramer,* 130 *N.J.* 536, 617 *A.*2d 663 (1993). Effective May 16, 1997, respondent was suspended for six months for failing to abide by a client's decisions about the objectives of the representation and obtaining a proprietary interest in the cause of action or subject matter of the litigation. *In re Kramer,* 149 *N.J.* 19, 691 *A.*2d 816 (1997). On September 25, 1998 we denied respondent's petition for reinstatement for failure to comply with the reinstatement rule in numerous respects.

Although respondent formerly maintained a law office in New Jersey, he currently resides in California.

*    *    *    *    *    *    *    *

The Office of Attorney Ethics ("OAE") complaint includes a request for respondent's disbarment, based on his disbarment by the New York disciplinary authorities. The New York disbarment was grounded, in part, on respondent's six-month suspension in New Jersey, as well as other misconduct, as discussed below. In addition to requesting reciprocal discipline, the OAE argued that disbarment was required by respondent's unrelated transgressions in New Jersey, including his improper investigation of a New Jersey federal judge, his failure to comply with the rules governing suspended attorneys and his failure to cooperate with disciplinary authorities. Because we have jurisdiction over motions for reciprocal discipline, the special master did not rule on that issue,

noting that respondent had preserved his constitutional challenges to the validity of the New York ethics proceedings.[1]

For the reasons expressed below, we have determined that disbarment is the only appropriate sanction to be imposed in this matter.

### Reciprocal Discipline—Count One

On September 24, 1998 the Appellate Division, First Department of the State of New York, disbarred respondent, noting as follows:

> In connection with his representation of Helen Selby before the United States District Court for the Southern District of New York, respondent was sanctioned for willful disobedience of discovery orders, as well as for making false statements in affidavits. He also refused to accept being dismissed by his client, and went so far as to file an unauthorized appeal and a subsequent petition for rehearing on her behalf.

> This pattern of resistance to a client's wishes was repeated during his representation of Jon E. DeLuca in New Jersey. Several times, respondent prevailed upon his ailing client to allow respondent to continue to litigate a weak case instead of accepting the other side's settlement offer. Once again, even after being relieved as counsel, respondent tried to block the parties' efforts to settle.

The court remarked that, during the past eleven years, respondent was sanctioned, criticized or disciplined thirty-eight times for professional misconduct involving numerous clients. While the court considered, in mitigation, that eight character witnesses spoke highly of respondent, it took into account that the witnesses were not aware of the disciplinary charges pending against re-

---

[1] Although the OAE did not file a formal motion for reciprocal discipline, pursuant to R. 1:20–14, we determined to treat the request in the complaint as such a motion. In motions for reciprocal discipline, there is no hearing before a district ethics committee or a special master, in the jurisdiction where reciprocal discipline is being sought. Instead, we review the briefs filed by the parties and conduct oral argument. Here, respondent filed a brief with the special master addressing the OAE's request for reciprocal discipline. In addition, in his brief filed with us, respondent's argument concerning reciprocal discipline spans more than sixty pages. Respondent, thus, had a full and fair opportunity to reply to the request for reciprocal discipline, just as if a formal motion had been filed. Accordingly, his due process rights were not violated by our deeming the request in the complaint as a formal motion for reciprocal discipline.

spondent. In assessing the applicable aggravating factors, the court stated as follows:

> Aggravating factors included the frequency of respondent's misconduct, and the fact that notwithstanding repeated reprimands for the same behavior, he persisted in using these tactics in subsequent lawsuits. The Panel also considered an article in *Lawyer's Weekly USA* in which respondent was quoted as referring to the findings of his numerous ethical violations as 'for chicken-shit stuff' . . . .

> Overall, the evidence presented at the hearing demonstrates that respondent has shown neither remorse nor self-control. Neither the public censure and private reprimand nor the temporary suspension he received from this court, nor the public reprimand from the Supreme Court of New Jersey, have deterred his misconduct. He appears unable to appreciate the magnitude of the harm he causes to his clients and to the courts before which he practices.

Thirty-six of the thirty-eight instances in which respondent was sanctioned, criticized or disciplined were summarized by Judge William Bassler of the United States District Court, District of New Jersey, in *Kramer v. Tribe*, 156 *F.R.D.* 96 (D.N.J.1994), *aff'd* 52 *F.3d* 315 (3d Cir.1995), *cert. denied* 516 *U.S.* 907, 116 *S.Ct.* 274, 133 *L.Ed.*2d 195 (1995). In that case, respondent represented Lightning Lube, Inc. in a lawsuit. Lightning Lube then retained Laurence Tribe and others as appellate counsel. When the litigation ended, Lightning Lube disputed both respondent's and Tribe's fees. Respondent and Lightning Lube settled their fee dispute with the payment of twenty-five percent of any reduction respondent could obtain in the fee owed to Tribe. Respondent then engaged in a course of conduct design to embarrass Tribe in order to coerce a settlement of the fee dispute. This conduct included threatening to sue all appellate counsel, to produce unfavorable publicity and to "ruin Mr. Tribe's reputation" if appellate counsel did not agree to reduce their fee from $2.7 million to $600,000. Respondent then followed through on his threats, filed suit and sent copies of the complaint to numerous newspapers and journals. Judge Bassler dismissed respondent's complaint, ordered him to pay counsel fees in excess of $70,000 and referred the matter to disciplinary authorities in New York and New Jersey, as well as to the United States Attorneys' Office

in New York and New Jersey for investigation of possible extortion.

In the *Selby* matter, on which respondent's disbarment in New York was partly based, United States District Judge Denise Cote granted the defendants' motion to dismiss the complaint and to impose sanctions on respondent and his client, Helen Selby. *Selby v. Arms*, 1995 *WL* 753894 (S.D.N.Y.1995). Judge Cote found that, in respondent's opposition to the motion, he submitted an affidavit with several false statements. The judge stated that "[i]n response to the motion to dismiss, Mr. Kramer repeatedly misrepresented the history of discovery in this case in an effort to deceive the Court regarding his and his client's failure to comply with virtually every Court Order issued in this case." In addition to dismissing the complaint, the judge determined that respondent and his client were jointly and severally responsible for the defendants' attorneys' fees and costs. Because the judge dismissed the complaint, she was not required to rule on the defendants' motion for summary judgment. She noted, however, that "[t]he record established through the summary judgment motion indicates strongly that this action was filed in bad faith."

On appeal, the Second Circuit Court of Appeals upheld the sanctions imposed on respondent and forwarded a copy of its order to the New York Supreme Court grievance committee for appropriate action.

When questioned about the *Selby* matter at the New Jersey ethics hearing, respondent testified that, in a subsequent order in response to his motion for reconsideration, Judge Cote "retracted a number of these statements." According to respondent, Judge Cote "refused to consider some of her errors in her original order that I had pointed out in my motion for reconsideration. She, in the sense that she addressed them, admitted that she had misunderstood and then proceeded to sanction my client anyway." Respondent's statement was untrue. A review of Judge Cote's March 25, 1996 opinion denying respondent's motion for reconsid-

eration indicates that, not only did she not retract any of her statements, but she also lifted the sanctions against respondent's client, thereby rendering respondent solely responsible for the defendants' attorneys' fees and costs of $18,445. The judge's opinion stated as follows:

> There has been repeated disobedience of Court Orders, and, most troubling to this Court, numerous false statements and false representations made to the Court. It consumes an enormous amount of Court time and resources to try to learn what the facts truly are when matters are poorly briefed or poorly presented, but that difficulty is compounded many times when false statements are made to the Court.... There is no effective lesser sanction, and, at any rate, dismissal is appropriate given the bad faith and misconduct that has been ongoing and repeated here.

As mentioned above, the OAE requested respondent's disbarment in New Jersey, based on his New York disbarment.

### Respondent's Investigation of Judge Bissell—Counts Two and Three

In 1991 respondent represented plaintiff Elliot Fineman and his corporation in litigation before Judge John W. Bissell of the United States District Court for the District of New Jersey. The defendant was Armstrong World Industries, Inc. ("Armstrong"). On April 18, 1991 the jury returned a verdict in favor of Fineman, awarding him more than $238,000,000 in compensatory and punitive damages. On June 20, 1991 Judge Bissell granted Armstrong's motions for judgment notwithstanding the verdict and for a new trial. The judge found that the verdict was against the weight of the evidence and caused by improper conduct on respondent's part:

> Mindful of the considerable time and resources expended by the parties and the Court itself, this Court attempted to cure the numerous improprieties by instructions to the jury. As is evidenced by the verdict in this matter, such instructions were to no avail. There is no doubt in this Court's mind that the verdict in this matter is the result of passion, prejudice, sympathy and totally unjustified outrage, instilled and fertilized by plaintiffs' counsel. The inferences which counsel asked the jury to make were unreasonable and illogical; only by prejudicing the jurors (as exemplified most dramatically in Mr. Kramer's summation) were plaintiffs able to obtain a verdict. Disparaging witnesses and defense counsel to such an extent undoubtedly added fuel to the flames of the jury's passion engendered by the other colorful yet prejudicial arguments of counsel. This Court's opinion regarding the

defendant's motion for J.N.O.V., particularly those portions analyzing the evidence and the reasonable inferences therefrom, demonstrates the considerable extent to which this jury was led by the inflammatory rhetoric of plaintiffs' counsel down a path that fatally diverged from the evidence.

This Court notes that Mr. Kramer's conduct throughout the course of this trial has led to the imposition of a restraining order, consideration of motions for a mistrial, delays resulting therefrom, and more. The defense counsel, as a result of plaintiffs' counsel's acts, were required to commit substantial time and energy to addressing tangential issues at key points during the trial.... The only conclusion that this Court is able to reach is that plaintiffs' counsel deliberately set out to sabotage Armstrong's defense in every way possible, without regard to rules of conduct, rules of law, and orders and directions from this Court.

Other actions by Mr. Kramer are pertinent to the circumstances under which a new trial may be conducted. He effected a unilateral *de facto* cancellation of a date before this Court to settle the form of judgment upon the jury verdict, in order to attend a press conference (with Mr. Fineman) at Armstrong's corporate headquarters. In a further, bizarre development which just came to the Court's attention, a circumstance which might even be considered humorous if presented in isolation, the Court has learned that, since October 11, 1990, Mr. Kramer has been unauthorized to practice law in the State of New Jersey for failure to make his required contributions to the Clients' Security Fund. Considered in the context of Mr. Kramer's other conduct in connection with this case, however, both inside and outside the courtroom, this development is but further evidence of Mr. Kramer's complete disregard for rules and procedures governing the propriety and civility of an attorney's conduct. Regretfully, his transgressions of this sort have not been limited to the present matter.

    \*    \*    \*    \*    \*    \*    \*    \*

This Court was present during the entire trial and has carefully reviewed the record herein. It observed the conduct and demeanor of plaintiffs' trial counsel, and recalls vividly both the contents and tone of his remarks. Based on this experience with the record, and with the atmosphere which pervaded this trial, this Court finds that failure to grant the defendant's motion for a new trial would constitute a gross miscarriage of justice. The Court's curative instructions were to no avail in the face of Mr. Kramer's pervasive and flagrant appeals to speculation, sympathy, outrage and revenge from the jury. The cumulative effect of all such conduct is far greater than that experienced by the Court on a day-to-day basis. Indeed there could be no stronger testament to the success of plaintiffs' improprieties than the indefensible verdict reached by the jury. For all the reasons set forth above, the defendant's new trial motion is granted. (Footnotes and references omitted).

[*Fineman vs. Armstrong World Industries, Inc.*, 774 *F.Supp.* 266, 273–276 (1991).]

Based on Judge Bissell's decision on the defendant's motions, respondent suspected that the judge had been improperly influ-

enced and determined to conduct a private investigation on possible corruption.

In August 1991 respondent hired Arthur LeTourneau, a private investigator and former Chicago police detective, to investigate Judge Bissell. An August 13, 1991 retainer agreement was signed by LeTourneau and by respondent, on behalf of Reitrac Corporation, a fictitious corporation. According to the agreement, LeTourneau was to provide investigative services "which have previously been specified." The agreement did not furnish any details about the investigation. Among other key provisions of the agreement were the following: (1) the investigation was to be confidential; if, through LeTourneau or his agents, the investigation was disclosed, all sums paid or payable to him were forfeited; (2) time was of the essence; (3) LeTourneau would receive a performance bonus of $250,000 "out of the net settlement proceeds upon settlement of the matter with the adversary, provided that LeTourneau obtains the corroborating evidence prior to any such settlement ... 'corroborating evidence' shall consist of that evidence that is acceptable to, and can be utilized by the Federal Bureau of Investigation"; (4) if LeTourneau violated any law, the agreement became void and all sums paid or payable to him would be forfeited; and (5) LeTourneau was required to obtain prior approval from Reitrac before proceeding with any step in the investigation. During 1991, respondent paid LeTourneau $11,809 for investigative services.

Thereafter, LeTourneau and the associates he hired undertook to investigate Judge Bissell, providing respondent with written reports in August, September and October 1991. Through an associate named John Riede, LeTourneau illegally obtained Judge Bissell's personal American Express credit card.records for the period from August 10, 1989 through October 13, 1991. LeTourneau provided those records to respondent, who, in turn, gave Fineman a copy. Although Fineman questioned their legality, he relied on respondent's advice that it was permissible for him to review Judge Bissell's personal credit card records.

Riede obtained the records by gaining access to American Express computer records, in violation of 18 *U.S.C.* § 1030(a)(2)(A)(2), which provides as follows:

(a) Whoever ...

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains—

(A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.); ...

shall be punished as provided in subsection (c) of this section.

Riede, a former New York City police detective, entered a guilty plea to computer fraud in the United States District Court, District of New Jersey. He received probation and was ordered to pay a fine. According to the ethics complaint, respondent was not prosecuted for consumer fraud because the statute of limitations had expired by the time of Riede's guilty plea. Respondent, however, contended that he was not prosecuted because he only received the records and because such receipt of credit card records is not illegal.

According to the OAE, respondent intended to use any adverse information about Judge Bissell to his client's advantage at an upcoming settlement conference scheduled for September 1991. As mentioned above, the retainer agreement with LeTourneau provided that time was of the essence and that LeTourneau would be paid a $250,000 bonus from the settlement proceeds, if he obtained corroborating evidence before the September settlement conference. LeTourneau's initial report to respondent, dated August 30, 1991, stated that "[w]e are pushing it since there is pressure on you to meet for settlement conferences in September."

Respondent, for his part, claimed that, rather than use any information to "blackmail" Judge Bissell, he had intended to bring the matter to the attention of the Federal Bureau of Investigation ("FBI"). He pointed out that the provision in the retainer agreement requiring the evidence obtained by the investigation to be

acceptable to the FBI demonstrated his intention to turn the matter over to the legal authorities.

Other issues in dispute were whether respondent knew in advance that LeTourneau or his associates would be obtaining Judge Bissell's credit card records and whether respondent was aware that such conduct was illegal. Respondent denied any advance knowledge that the credit card records would be obtained and claimed ignorance that such conduct was illegal. The OAE contended, however, that respondent knew, from the outset of the investigation, that LeTourneau's investigation could involve illegal activity. According to the OAE, by placing in the agreement a provision for LeTourneau's forfeiture of compensation if he violated any laws, respondent obviously anticipated the possibility that laws could be breached. Moreover, the OAE argued, although respondent professed concern about the propriety of LeTourneau's conduct, he never met with or learned the identity of the associates that LeTourneau hired. Had respondent actually been concerned about the investigators' actions, the OAE maintained, he would have made the effort to meet them and to emphasize that no laws were to be disregarded.

In addition, the OAE asserted that, even if respondent had not been aware initially that LeTourneau would illegally obtain Judge Bissell's credit card records, he had to know of LeTourneau's intended seizure after he received LeTourneau's September 14, 1991 report. The report stated that the cost for obtaining credit card records for a one-year period was about $3,000 and that the "endeavor" could "turn out to be fruitless." LeTourneau continued as follows: "[P]lease consider the difficulties of obtaining certain data without using certain services, the cost for which is substantial. Discuss this with our client and please advise me soon."

Although the September 14, 1991 report apparently addressed the future acquisition of the records, respondent argued that he thought that LeTourneau had already obtained them. Respon-

dent acknowledged, however, that, because the credit card records contained a charge incurred on September 27, 1991, they were obviously elicited after the date of the report, September 14, 1991. Respondent's only explanation was that, because the agreement required LeTourneau to obey all laws, he assumed that LeTourneau had obtained the records legally. In his answer to the ethics complaint, respondent contended that there are "a host of ways" to get credit card records lawfully. At the ethics hearing, when respondent was asked for examples, he stated that they could be obtained from credit reporting services. According to the OAE, however, impermissibly using a credit card report obtained from a credit reporting service is a violation of the *Fair Credit Reporting Act*, 18 *U.S.C.A.* § 1681.

In addition to hiring LeTourneau, respondent conducted part of the investigation of Judge Bissell independently. On September 18, 1991 he ordered from Sonny Hopson, presumably an acquaintance, a title search of real estate owned by Judge Bissell, directing that "[u]nder no circumstances should you disclose your identity or mine." Hopson, who apparently worked for a title insurance agency, used the name of a fictitious buyer, Norma Thompson. Hopson sent to respondent a title insurance commitment indicating that Judge Bissell had contracted to sell real estate to Norma Thompson and enclosed the results of a judgment and lien search containing mortgage information about the property. When respondent was asked, at the ethics hearing, if he was concerned about the erroneous information in the title agency's file, indicating that Judge Bissell was selling his property to Norma Thompson, and about its harmful effect on the title, he replied that he had not considered the consequences. His explanation for his desire to remain anonymous was that "Judge Bissell was a vindictive, petty man" who "wouldn't hesitate for a moment to try to hurt me or hurt, perhaps, Mr. Hopson." T118 [2].

---

[2] T refers to the October 5, 2000 hearing before the special master.

In his post-hearing brief to the special master, respondent argued that he could not be disciplined for any wrongdoing in connection with the title search because the complaint did not contain any reference to that issue:

> As the New Jersey Supreme Court held a few months ago in refusing to disbar an attorney notwithstanding the recommendations of the courts below: 'It is utterly unfair to base disbarment on allegations not even charged, much less proven.' *In re Pena*, 164 N.J. 222, 753 A.2d 633 (2000).
>
> [Summation Brief of Respondent at 9 n.2]

A review of *In re Pena, supra,* 164 *N.J.* 222, 753 *A.2d* 633 (2000), reveals not only that the Court disbarred Pena, but also that respondent quoted from the dissenting opinion in that case.[3]

The complaint charged that respondent's investigation of Judge Bissell violated *RPC* 8.4(a), (b), (c) and (d).

### Respondent's Non-compliance With R. 1:20–20—Count Four

As mentioned in the ethics history above, by Court order dated April 24, 1997 respondent was suspended for six months, effective May 16, 1997. He, thus, had more than three weeks' notice of the starting date of his suspension. *R.* 1:20–20 imposes the following requirements, among others, on suspended attorneys:

- may not use stationery on which the attorney's name appears as a lawyer or attorney-at-law;
- as to litigated proceedings, must promptly give notice of the suspension to each client, opposing counsel and assignment judge. The notice to clients must advise them to obtain another attorney and to substitute that attorney for the suspended attorney. The notice to opposing attorneys and assignment judges must clearly indicate the caption and docket number of each case and the name and residence of each client. If a client does not obtain a substitute attorney within twenty days of the mailing of the notice, the suspended attorney must move *pro se* for leave to withdraw from the matter. The disciplined attorney must promptly deliver the file to the new attorney, or to the client if no attorney is selected;
- must maintain all records relating to compliance with *R.* 1:20–20;
- must within thirty days after the date of the attorney's prohibition from practice file with the OAE director a detailed affidavit specifying how the attorney has complied with *R.* 1:20–20, attaching a copy of all correspondence sent pursuant to the rule and an alphabetical list of all clients represented at the time of

---

[3] The quoted language appears at 164 *N.J.* at 241, 753 A.2d 633.

suspension. Failure of an attorney to substantially comply with the rule shall preclude consideration of an application for reinstatement and shall constitute a contempt of court.

When asked by the presenter what steps he had taken to comply with the above rule, respondent replied as follows:

The only things I remember, Mr. Sweeney, were, as you know, number one, contacting all the judges in all of my cases in New Jersey in writing and telling them I had been suspended, filing it with the clerk of the court; and number two, at some point ... I sent an affidavit to somebody at your office.

[T124]

With respect to the requirement that he notify his clients of his suspension and of the need to obtain substitute counsel, respondent maintained that he had instructed his secretary to send a letter to each current client. Respondent did not produce copies of any of the letters, stating that he could not get his records out of storage. Respondent's petition for reinstatement, introduced as an exhibit at the ethics hearing, demonstrated that, rather than providing copies of the letters to us, as required by *R.* 1:20–21, he merely stated that he had timely notified all clients of the suspension. Respondent attached to his petition for reinstatement a statement signed by his secretary, indicating that she had mailed notices of the suspension to all clients in pending cases, with the exception of one client, David Kass, who received a later notice because she was not aware that his case was active.

Respondent's testimony that he had filed an affidavit with the OAE was incorrect. He was referring to the affidavit that accompanied his petition for reinstatement filed with us. Notwithstanding the clear language of *R.* 1:20–20 and *R.* 1:20–21, respondent claimed ignorance of the requirement of two separate filings: an affidavit of compliance with *R.* 1:20–20, to be filed with the OAE director within thirty days of the suspension, and a petition for reinstatement to be filed with us.

In his November 7, 1997 petition for reinstatement respondent certified that he had complied with the requirements of his suspension. At that time, he still had not filed the affidavit of compliance with the OAE director. In fact, respondent has never

done so. The OAE opposed respondent's petition for numerous reasons, including his failure to file an affidavit of compliance. At the ethics hearing, respondent testified that he had complied with the court rules to the best of his ability. He had no recollection of whether he had read both *R.* 1:20–20 and *R.* 1:20–21, before filing the petition for reinstatement.

In a February 22, 2000 communication to the special master, during the pre-trial phase of the ethics proceedings, respondent asked the OAE to withdraw count four of the complaint (failure to comply with *R.* 1:20–20), stating: "I enclose the affidavit that I sent to Ms. Hill. Accordingly, I respectfully ask that [the presenter] withdraw that count." Respondent, thus, claimed a belief that filing a deficient petition for reinstatement with us six months after he was suspended constituted compliance with that part of *R.* 1:20–20 requiring suspended attorneys to file an affidavit of compliance with the OAE within thirty days of the date of the attorney's prohibition from practice. It should be noted that, on September 25, 1998, about seventeen months before respondent requested the withdrawal of this count of the complaint, we informed respondent that his petition for reinstatement was denied, in part because he failed to file an affidavit of compliance with the OAE. On March 13, 2000 the special master denied respondent's motion to dismiss count four of the complaint, stating: "The affidavit you have provided to me does not comply with R. 1:20–20. Apparently, your affidavit relates to R. 1:20–21, which deals with reinstatement after the suspension period has expired." Thus, despite the fact that respondent was informed by us, by the special master and by the OAE that the petition for reinstatement filed with us did not constitute the filing with the OAE of an affidavit of compliance with *R.* 1:20–20, he nonetheless claimed that he had fully complied with the latter requirement.

As noted earlier, respondent testified at the ethics hearing that he had given notice of his suspension to all the judges before whom he had pending litigation. Although *R.* 1:20–20 requires attorneys to maintain copies of all records relating to compliance

with the rule, respondent contended that he did not have copies of the notices he had sent to the judges. During the ethics hearing, the following exchange took place between respondent and the presenter:

Q. Did you maintain any evidence of the notice documents that you sent to the courts, did you maintain copies?

A. ... [T]he only thing I can tell you is whatever is in the clerk's office for that particular case would have it....

Q. If I, from the Office of Attorney Ethics, want to check to find out whether Steven Kramer represented a client in a particular matter, I mean, I have to go check 21 counties to find out?

A. As opposed to calling me and asking me if I—maybe I'm misunderstanding you, but if I was an attorney and I wanted to know if Steve Kramer represented John Smith I'd pick up the phone and say, Mr. Kramer, do you represent John Smith?

Q. Other than what's in the record, the 42 exhibits that I submitted, do you have any other documentation in your files ... that you provided by way of notice to a court of your suspension?

A. All I can tell you is I've, with every—to my recollection, every case that I was handling at the time in state court in New Jersey I filed a motion to stay the proceedings until my suspension was over. And obviously by doing it you necessarily advise the court of the suspension.

[T127]

Indeed, in his petition for reinstatement filed with us, rather than attach copies of the notices sent to the courts and his clients, respondent merely stated that "[a] copy of the letters are [sic] on file with the clerk's offices in the county in which the cases were pending" and "[t]he clients can confirm that they received the letter." *R.* 1:20–20, however, requires attorneys to attach to the affidavit copies of all correspondence sent pursuant to that rule.

As required by the rules, respondent should have filed a motion for leave to withdraw from cases in which clients did not obtain substitute counsel. Instead, he asked for a stay of the proceedings until his suspension was complete. In at least three matters pending in Superior Court, respondent sent the following letter to the court clerk of the relevant county:

Pending either conclusion of suspension period (Nov. 16) or favorable disposition by the federal court in the case entitled *Kramer v. New Jersey Supreme Court*[4], please be so kind as to place the above-referenced case in suspension.

---

[4] Several days after respondent was suspended, he filed a complaint in federal court, contending that his civil and constitutional rights had been violated. On

Apparently, this is the communication that respondent claimed served both as notice to judges of his suspension and as a motion to stay matters during the period of his suspension. When asked why he had not moved to be relieved as counsel, as required by the rule, respondent's answer was that he was concerned that his clients would be left "defenseless" and that he wanted to protect them. Although there was no formal mechanism in the court rules for this procedure, respondent allegedly hoped that the court would exercise its equitable powers to grant his request. Every judge denied respondent's request for a stay.

Respondent's failure to comply with *R.* 1:20–20 created confusion among his clients and an administrative burden for the courts. On July 1, 1997 respondent sent the above-quoted letter to the court clerk in Somerset County, requesting a stay in a matter in which he represented Louisa Pazienza. On July 18, 1997, Judge Helen E. Hoens, to whom the matter had been assigned, wrote the following to respondent:

> *Rule* 1:20–20 plainly requires you to turn over all of your pending matters to another attorney during your period of suspension and does not permit the Court to inactivate matters for this reason. Indeed, it is troubling to learn that you have not already done so, in light of the length of time which has already passed since the Supreme Court's Order.

Judge Hoens further indicated that she was adjourning a pending summary judgment motion from July 25, 1997 until August 8, 1997, "solely for the purpose of affording you time to comply with *Rule* 1:20–20" so that Pazienza could find representation.

In a July 24, 1997 letter to Judge Hoens, respondent's client, Pazienza, stated as follows:

> Until this week it was my understanding that Mr. Kramer had asked for a 'stay' of this case, until the suspension was completed or until his appeal of this disciplinary action against him was decided. After speaking with the court clerk this week, I

---

July 9, 1997 the United States District Court dismissed that lawsuit. In reply to the special master's question at the ethics hearing on October 5, 2000, respondent stated that he had not appealed the dismissal. He did not, however, disclose that, on December 8, 1997, his petition for writ of certiorari to the United States Supreme Court had been denied.

was informed this is not the case and was shocked to realize I have no legal representation at this time.

On July 29, 1997 Judge Hoens replied to Pazienza's inquiry and again adjourned the pending summary judgment motion until September 12, 1997, shortly before the September 29, 1997 trial date.

On June 13, 1997 respondent sent a similar letter to the Monmouth County court clerk, requesting a stay in a matter in which he represented Anthony Cancro, who eventually obtained substitute counsel. That attorney later filed a certification in the litigation, detailing respondent's failure to cooperate with his and his client's requests to turn over the file.

On July 18, 1997, Judge Jack Lintner, then the presiding judge of the civil division in Middlesex County, sent almost identical letters to four of respondent's clients who had matters pending in Middlesex County, enclosing a copy of the order suspending respondent. Judge Lintner informed respondent's clients as follows:

As a result of the fact that Mr. Kramer may not have complied with the prompt notice requirement of the Rule, on July 9 I ordered him to appear before me, pro se, on Friday, July 18, 1997 to show cause whether or not he has complied with the Rule by filing a prompt notice and if he has why he has not moved to be relieved as counsel. This order was sent in light of the fact that almost two months had elapsed since the effective date of Mr. Kramer's suspension. In response Mr. Kramer advised me that he notified his clients, by letter of July 14, of the requirement to substitute in new counsel. On July 18, Mr. Kramer appeared before me and I advised him that unless his clients substitute new counsel prior to August 7, 1997, I would order that he be relieved as counsel effective August 7.

Judge Lintner further notified two of respondent's clients of case management conferences at which they or substitute counsel had to appear and notified the other two clients of his intention to place their cases on the dismissal list for failure to prosecute, in light of the absence of activity on the file.

In addition to the above Superior Court cases, at the time of his suspension respondent was the attorney of record for David Kass, in a matter pending before the New Jersey Supreme Court. *R.* 1:20–20 requires suspended attorneys to notify the clerk of the

appropriate appellate court that they have been suspended. Respondent failed to notify the Court clerk of his suspension. On July 30, 1997 the clerk's office notified respondent of a tentative date for oral argument on the *David Kass* appeal and requested that he immediately return a form providing certain information about the case. Respondent returned the form more than one month later, with the following language inserted: "see order of 5/16/97. I am prohibited from attending." He failed to sign the form or otherwise identify himself as its sender. The clerk's office then left messages for respondent at three different locations, in an effort to determine whether he had notified his client, Kass, of his suspension. Respondent failed to return the telephone calls. At some point, when Kass telephoned the Court clerk to ask about the status of his case, he found out, for the first time, that respondent had been suspended. The Court clerk was required to adjourn the oral argument to permit Kass to obtain new counsel.

Respondent testified that, when he received the form from the Court clerk, he assumed that it had been sent in error and that, by referring to the May 16, 1997 [5] order on the returned form, he had notified the clerk's office of its error.

Respondent could not explain why he had delayed returning the form to the Court clerk for almost a month or why he had failed to return the Court clerk's telephone calls.

When respondent wrote to the various clerks' offices to request stays of pending cases, he already had been suspended for about two months. Yet, he continued to use stationery indicating that he was an attorney admitted to practice in New Jersey, contrary to *R.* 1:20–20. In particular, in the *Cancro* matter, in a July 3, 1997 letter to Judge John D'Amico's law clerk, respondent stated the following: ·

My client Mr. Cancro asked that I forward his interrogatory answers to you. I reiterate my respectful request for the sake of my client, that this matter be held in abeyance, pending the suspension order.

---

[5] The order, although effective May 16, 1997, was filed on April 24, 1997.

Respondent referred to Cancro as "my client" twice and enclosed interrogatory answers as if he still represented Cancro. He later defended his use of the stationery by pointing out that, despite his suspension, he was still admitted in federal court in New Jersey. This argument fails to explain why, in a state court matter, he continued to use stationery indicating that he was admitted in New Jersey. Also on July 3, 1997 respondent "faxed" interrogatory answers to his adversary. According to respondent, he sent the answers because he did not want to be accused of making an *ex parte* communication with the judge. As mentioned above, Cancro's new counsel filed a certification stating that respondent had failed to cooperate in turning over his client's file.

### Respondent's Failure To Cooperate With Disciplinary Authorities—Count Five

On January 22, 1999 the OAE sent eight documents to respondent concerning its investigation of the matter involving Judge Bissell. The OAE asked respondent whether he had previously received those documents or forwarded them to his client, Fineman. On March 16, 1999 the OAE acknowledged receipt of respondent's March 11, 1999 reply and asked him if he was aware of any facts that would support a negative response to the questions asked in the OAE's January 22, 1999 letter. On April 9, 1999 the OAE asked respondent to reply to its March 16, 1999 letter by April 16, 1999. Respondent ignored the OAE's request for a timely reply. The OAE cautioned respondent, in an April 22, 1999 letter, that failure to provide a fully candid and complete reply within five days could result in a charge of a violation of *RPC* 8.1. By letter dated April 22, 1999, respondent claimed that he was unable to provide any additional information to the OAE. On May 3, 1999 the OAE sent the following letter to respondent:

In my letter of March 16, 1999, I asked that you advise me if you were aware of any facts which would provide grounds for you to deny any of eight questions set forth in my letter of January 22, 1999. In your faxed response of April 22, 1999, you failed to answer this simple question. Either you are aware of such facts or you are not. If you are aware of such facts you are required to provide them. If you are not, you are required to so state.... I would therefore request that you

provide me with your response to the above question on or before Monday, May 10, 1999.

Respondent never replied to the OAE's request. At the ethics hearing, respondent finally testified that he had no facts to deny the questions put to him more than twenty months earlier.

Respondent's obvious indifference to this disciplinary matter continued during the pre-hearing phase. In an October 12, 1999 letter, the special master asked the presenter and respondent to produce, by November 15, 1999, a pre-hearing report and to provide their "fax" numbers. Respondent ignored the special master's request. After additional letters were exchanged, the special master sent the following letter to respondent on January 25, 2000:

> I have receive [sic] your fax memo of 1/25/00 requesting more time to supply a prehearing report.
>
> Your first deadline for the report was 11/15/99. You did nothing. Even though you did nothing I extended your deadline to 12/31/99. Again you did nothing. On 1/7/00 I faxed you a 'last chance' memo. This time, finally, you responded. You called me on 1/8/00 and I gave you until 1/28/00. Obviously, you have again done nothing.
>
> You have been extremely uncooperative. Your request for another extension is denied. If your report is not received by 1/28/00 I will recommend to the OAE director that an RPC 8.1 charge be added against you and I will schedule the hearing for late February.

On January 30, 2000, two days after the deadline, respondent finally "faxed" the pre-hearing report to the special master.

Although the special master agreed to conduct the pre-hearing conference by telephone to accommodate respondent, respondent did not cooperate with the scheduling of the conference. On February 8, 2000 the special master's assistant "faxed" a notice to respondent, stating that, if he did not contact her that day to schedule the pre-hearing conference, the special master would conduct the conference without him. The pre-hearing conference took place on February 17, 2000. On February 22, 2000 the special master signed a pre-hearing order containing the following provision:

OAE shall provide respondent with a form of subpoena. If respondent decides to subpoena any witnesses he must submit them to me for signature. If he proposes to subpoena any sitting judges, I may refuse to sign such subpoenas unless I am satisfied that such is proper and that there is no reasonable alternative available by which to produce the intended testimony.

In a March 21, 2000 letter to the OAE and respondent, the special master cautioned respondent as follows: "I have not received from Mr. Kramer any subpoenas he wishes to have me execute. If he still wishes to do so, I suggest he do so immediately." Various letters regarding discovery, exhibits, witnesses, hearing dates and similar hearing issues were exchanged. On October 1, 2000, four days before the scheduled hearing, respondent sent to the special master a binder containing about 1000 pages that respondent wanted to introduce into evidence. He also asked (1) that the special master request the presenter to "fax" to him a blank subpoena; (2) that the special master request Judge Bissell to appear at the hearing as a witness; (3) whether the hearing would be transcribed; (4) whether he was required to disclose the names of the witnesses he intended to call to testify; (5) whether the OAE intended to call any witnesses; (6) whether the hearing could be concluded in one day because he was having difficulty making flight arrangements to return to California; and (7) whether he could buy a rule book. The special master denied respondent's request that he contact or subpoena Judge Bissell. Although the special master could not guarantee that the hearing would conclude in one day, he offered to accept character witness testimony by affidavit, in order to expedite the hearing process.

On the afternoon of October 4, 2000, the day before the hearing, respondent "faxed" to the special master a four-page letter containing numerous requests, including the appearance of an OAE representative at the hearing, the production of complaints against judges and the disposition of those complaints. Although the record is silent in this regard, apparently respondent's requests were denied.

\* \* \* \* \* \* \* \*

As mentioned above, the special master did not rule on the motion for reciprocal discipline, correctly deferring that issue to us. With respect to the *Bissell* matter, the special master determined that respondent was aware that the investigator was about to illegally obtain the judge's credit card records. The special master rejected respondent's claimed belief that the records had been secured lawfully, discrediting respondent's reliance on the agreement of LeTourneau, who was not an attorney, to forfeit his fee if he violated any law. The special master pointed out that, because the credit card records (1) contained personal charge account transactions concerning the judge's private life and (2) cost more than $6,000, respondent had to know that they were procured illegally. The special master concluded that, upon receiving the documents, respondent should have brought the matter to the FBI's attention. Instead, the special master noted, respondent shared them with his client, who questioned their legality. The special master ruled that (1) by hiring a private detective to conduct a "secret and personally invasive investigation" of Judge Bissell, respondent violated *RPC* 8.4(c) and (d); (2) by knowingly authorizing and paying for the illegal retrieval of the judge's credit card records, respondent violated *RPC* 8.4(b); and (3) by improperly ordering a title search on Judge Bissell's property, respondent violated *RPC* 8.4(a).

As to respondent's non-compliance with *R.* 1:20–20, the special master found that, as of the date of his report, respondent still had not complied with the rule and had not properly applied for reinstatement:

> Despite the fact that respondent's non-reinstatement is clearly his own fault, in his answer to Count Four he has the temerity to proclaim '... the suspension was supposed to be for six months. It has lasted two and one half years without any more explanation (i.e. none) than that given to the Joseph created by Kafka.'

The special master found that respondent's failure to comply with the requirements governing suspended attorneys constituted contempt of court, contrary to *R.* 1:20–20(b)(14) and *RPC* 8.4(d).

For respondent's failure to cooperate with the OAE the special master found a violation of *RPC* 8.1(b), noting that respondent persisted in refusing to acknowledge the receipt of eight documents, only to admit at the hearing that he had indeed received them.

The special master recommended disbarment, citing *In re Vincenti*, 152 *N.J.* 253, 704 *A.*2d 927 (1998).

\* \* \* \* \* \* \* \*

Following a *de novo* review of the record, we are satisfied that the special master's finding that respondent's conduct was unethical is supported by clear and convincing evidence.

We find that respondent's ethics violations were egregious. His investigation of Judge Bissell's private affairs was indefensible. Respondent claimed that, after the judge granted a motion overturning a $238,000,000 verdict in his client's favor, he became suspicious that the judge had been subject to improper influences, *i.e.*, that he had been bribed, presumably by Armstrong. Judge Bissell's opinion granting Armstrong's motion refers to numerous incidents during the trial when respondent's improprieties caused him to take various measures, such as giving curative instructions to the jury, imposing a restraining order, entertaining motions for a mistrial and so on. Given this history, respondent had no reason to be suspicious when Judge Bissell granted Armstrong's motions. Although respondent must have been disappointed that such a large verdict had been set aside, he should not have been surprised about—let alone suspicious of—the outcome of the case.

Moreover, if respondent had truly believed that Judge Bissell had accepted money or other items of value to change the outcome of the case, he should have brought the matter to the attention of the appropriate ethics or law enforcement authorities. Despite respondent's contention that his motive to investigate Judge Bissell was to produce evidence of corruption to be turned over to the FBI, it is obvious that respondent sought to use such information to coerce a settlement. The agreement with LeTourneau provid-

ed that time was of the essence and that LeTourneau would receive a $250,000 bonus out of the settlement proceeds if he obtained evidence against Judge Bissell before a settlement. A settlement conference had been scheduled for September. Had respondent's motives been simply to turn over evidence to the FBI, time would not have been so critical.

Respondent's contentions that (1) he expected LeTourneau to obey all laws; (2) he did not know in advance that LeTourneau would obtain Judge Bissell's private credit card records; and (3) he was not aware of the illegality of procuring those records are all devoid of merit and contradicted by the record. From the beginning, respondent was very careful to conceal the investigation. Under the name of Reitrac, a fictitious corporation, he entered into a retainer agreement whereby LeTourneau was to provide investigative services that "have previously been specified." Respondent, thus, refused to set forth in writing either his name or the purpose of the investigation. The agreement itself required that the investigation remain confidential and stated that, if it were disclosed through LeTourneau or his agents, respondent's obligation to pay for the services would be extinguished. Respondent's precautions to preserve secrecy clearly underscore his awareness that the purposes of the agreement were nefarious.

The OAE pointed out that the inclusion of the clause that LeTourneau would forfeit all sums paid or payable to him, if he violated any laws, implied that respondent anticipated that possibility. We agree. Not only had respondent considered that LeTourneau might violate the law, but he also addressed the consequences of such misconduct. Moreover, although respondent professed concerns about the legality of LeTourneau's actions, he did not meet any of LeTourneau's agents to impress upon them the importance of complying with the law. Clearly, respondent had to know, after reviewing LeTourneau's reports, that laws would be broken. Those reports stated that LeTourneau's agents have "already developed sufficient knowledge of the subject's

business and personal comings and goings and are now looking into family circumstances and certain financial situations."

Respondent's denial of prior knowledge that Judge Bissell's credit card records would be illegally obtained is unworthy of belief. LeTourneau's September 14, 1991 report to respondent stated that the cost of credit card records for a one-year period was $3,000 and that the expense could "turn out to be a fruitless endeavor... [P]lease consider the difficulties of obtaining certain data without using certain services, the cost for which is substantial. Discuss this with our client and please advise soon." It is obvious from LeTourneau's use of the future tense that he had not yet acquired the judge's records. In fact, LeTourneau asked respondent to advise him on this issue, after discussing the matter with his client, Fineman. This request complied with the retainer agreement provision requiring LeTourneau to obtain respondent's prior approval before proceeding with any step in the investigation. Respondent never complained that LeTourneau violated the provision of the agreement requiring his prior approval of all steps in the investigation.

Similarly, respondent's claimed ignorance that acquiring Judge Bissell's credit card records violated the law lacks credibility and is unsupported by the record. Respondent's contention that he relied on LeTourneau, who was not an attorney, to exercise his judgment on the lawfulness of his actions is meritless. Moreover, the high cost of the records acquisition must have alerted him that such conduct was not legal. Respondent's client, Fineman, immediately questioned the lawfulness of that activity, upon his receipt of the records from respondent. At the ethics hearing, respondent testified that he believed that credit reporting agencies could legally provide credit card records. Respondent's belief was not only wrong, it was irrational. Respondent had to know that credit card records are private and that the $3,000 per year cost was not a legitimate expense.

In addition to hiring LeTourneau, respondent undertook part of the investigation himself. He ordered a title search of Judge Bissell's real property, instructing Sonny Hopson, apparently a friend or acquaintance who worked for a title insurance agency, not to reveal respondent's or his own identity. Again, respondent's actions were marked by deceit and concealment. Hopson used the name of a fictitious buyer, Norma Thompson, in order to obtain the title search. Respondent showed no concern for potential title problems that he created for the judge.

In his brief to the special master, respondent argued that, because the complaint did not refer to the title search, he could not be disciplined for his conduct in that regard. He did not, however, object to the introduction of such evidence in the record. We, therefore, deemed the complaint amended to conform to the proofs. *R.* 4:9–2; *In re Logan,* 70 *N.J.* 222, 232, 358 *A.*2d 787 (1976). Of more interest was respondent's assertion that the Court in *In re Pena,* 164 *N.J.* 222, 753 *A.*2d 633 (2000) refused to disbar an attorney. Respondent quoted the following excerpt from the opinion: "It is utterly unfair to base disbarment on allegations not even charged, much less proven." Respondent's contention was wrong for two reasons: first, the Court disbarred Pena; second, the quotation on which respondent relied appeared in the dissent and did not support respondent's proposition that he could not be disciplined for conduct not specifically charged in the complaint. Respondent's reliance on a dissenting opinion, without disclosing that it was not the majority opinion, displayed careless research at best and duplicity at worst.

In short, respondent's investigation of Judge Bissell violated *RPC* 8.4(a), (c) and (d). By hiring others to investigate the judge, respondent violated *RPC* 8.4(a), which prohibits an attorney to violate or attempt to violate the *Rules of Professional Conduct* through the acts of another. The investigation constituted conduct involving dishonesty, fraud, deceit or misrepresentation and conduct prejudicial to the administration of justice, contrary to *RPC* 8.4(c) and (d), respectively. Although respondent was

charged with a violation of *RPC* 8.4(b) (commission of a criminal act), we determined not to make a finding in that regard because not only is the evidence overwhelming that respondent's actions violated *RPC* 8.4(a), (c) and (d), but the finding of a violation of *RPC* 8.4(b) would not change the required discipline for respondent's overall acts of misconduct.

We also find that respondent's non-compliance with *R.* 1:20–20 was substantial and wilful. That rule requires, among other things, that a suspended attorney promptly notify each client of the suspension, in order to afford the client the opportunity to hire new counsel. The suspended attorney must file a motion for leave to withdraw, if a client in a litigated matter does not obtain substitute counsel within twenty days of the mailing of that notice. Instead of filing a motion to be permitted to withdraw, respondent waited several months and then filed motions to stay the matters until he was reinstated. Not surprisingly, each judge denied the motion. Respondent's request was unreasonable, creating havoc with the courts and confusion among his clients.

Although respondent professed an altruistic motive for his actions, alleging that he did not want to leave his clients "defenseless," an inference arises that he did not wish to suffer financially by withdrawing from representation. He, thus, waited six to eight weeks to notify the courts of his suspension. He apparently hoped that, by the time the courts ruled on his motion, his reinstatement would be only a few months away. The courts, however, without exception denied his motions for stays. In the meantime, the various judges were required to adjourn matters and to inform respondent's clients of the need to obtain substitute counsel, an obligation that respondent failed to fulfill. Indeed, more than two months after his suspension, one of respondent's clients, Pazienza, complained in a letter to Judge Hoens that she was "shocked to realize I have no legal representation at this time." Court time was required, therefore, to correct the confusion and misunderstandings that respondent generated.

When the *David Kass* matter was pending before the Court, the clerk's office requested respondent to immediately return a form to provide information about the case. Respondent waited one month and then merely indicated, without explanation, that he was prohibited from attending the oral argument. He also failed to return telephone calls from the Court clerk's office. The Court's clerk was, therefore, forced to adjourn oral argument before the Court.

*R.* 1:20–20 also requires suspended attorneys to maintain copies of all records relating to compliance with the rule. Instead of producing evidence of such compliance, respondent displayed a pattern of abandoning that obligation to others. For example, respondent did not produce copies of the letters allegedly sent to his clients, but a statement from his secretary confirming that she had mailed the notices. Instead of producing copies of the notices allegedly forwarded to each judge, respondent invited the presenter to contact the clerk in each county in which one of his matters was pending, in order to obtain the notices. He also left it to the presenter to ascertain which counties should be contacted. Indeed, in the petition for reinstatement filed with us, respondent stated that "[a] copy of the letters are on file with the clerk's offices in the county in which the cases were pending" and "[t]he clients can confirm that they received the letter." Respondent refused to accept that it was his responsibility to provide proof of compliance with *R.* 1:20–20, not the burden of disciplinary authorities to obtain such proof in his behalf.

After the effective date of his suspension, respondent continued to use attorney stationery and to give other indications that he was practicing law during his suspension. When he wrote to the courts, requesting stays of pending matters, he used stationery indicating that he was admitted in New Jersey. The rule, however, requires suspended attorneys to file *pro se* motions. Instead of identifying himself as *"pro se,"* respondent continued to represent that he was admitted in New Jersey. In addition, when writing to Judge John D'Amico's law clerk in the *Cancro* matter,

respondent twice referred to Cancro as "my client." He also sent interrogatory answers to the court and to his former adversary. Respondent, thus, practiced law while suspended. Although he was not specifically charged with this impropriety, the record developed below contains clear and convincing evidence of a violation of *RPC* 5.5(a). Respondent did not object to the admission of such evidence in the record. In light of the foregoing, we deemed the complaint amended to conform to the proofs, *R.* 4:9–2; *In re Logan, supra,* 70 *N.J.* 222, 232, 358 *A.*2d 787 (1976), and find that he practiced law during the period of his suspension.

Also, despite respondent's claim of concern about his "defenseless" clients, when Cancro obtained new counsel, respondent failed to turn over the file, causing additional motions and delays.

Respondent's failure to comply with court rules continued when he sought reinstatement. Although he had failed to file an affidavit of compliance with the OAE director, he certified that he had complied with the requirements of his suspension. As noted above, respondent's petition for reinstatement was denied after he was given numerous opportunities to demonstrate compliance with the rule.

During his suspension, respondent was informed by the OAE and by us that the petition for reinstatement did not constitute the filing of an affidavit of compliance with the OAE director. Notwithstanding this information, respondent filed a motion before the special master, asking that the OAE withdraw the count of the complaint charging him with failure to comply with *R.* 1:20–20. The special master denied the motion, specifically advising respondent that the affidavit filed with us was not a substitute for the affidavit of compliance. Yet, respondent impudently testified at the ethics hearing that he had filed an affidavit of compliance, pointing to his petition for reinstatement. Obviously, respondent either cannot or will not comply with even the clearest and most simple requirements of the rules.

We, thus, find that respondent's delay of litigated matters violated *RPC* 3.2 (failure to expedite litigation) and *RPC* 8.4(d) and that his failure to comply with the rules governing suspended attorneys constituted contempt of court. *R.* 1:20–20(b)(14).

It is unquestionable, also, that respondent failed to cooperate with disciplinary authorities, in violation of *RPC* 8.1(b). On January 22, 1999 the OAE asked respondent if he had received eight documents or had forwarded them to his client, Fineman. The OAE then sent four additional letters, asking respondent to reply to that simple question. Respondent ignored the OAE's letters. Finally, at the ethics hearing, respondent conceded that he had received the documents.

Respondent also failed to cooperate with the special master. He repeatedly ignored deadlines and failed to cooperate with the special master's efforts to conduct a pre-hearing conference and to resolve matters, such as the issuance of witness subpoenas, discovery, exhibits and hearing dates. On March 21, 2000 the special master warned respondent that any subpoena requests had to be made immediately. Respondent, however, waited more than six months, until four days before the October 5, 2000 hearing, to ask the special master to arrange for Judge Bissell's appearance at the hearing and to request that the OAE "fax" him a blank subpoena form. Respondent also submitted exhibits spanning some 1000 pages and asked basic questions about the hearing, such as whether the OAE would be calling witnesses and whether he could obtain a rule book. Respondent's interest in the ethics proceedings arrived woefully late. Undeniably, thus, respondent's repeated failure to cooperate with the OAE and with the special master constituted violations of *RPC* 8.1(b).

In sum, respondent violated *RPC* 8.4(a), (c) and (d) by investigating Judge Bissell; he violated *RPC* 3.2 and *RPC* 8.4(d) and displayed contempt of court, pursuant to *R.* 1:20–20(b)(14), by failing to comply with the rules applicable to suspended attorneys; he violated *RPC* 5.5(a) by practicing law while suspended; and he

violated *RPC* 8.1(b) by failing to cooperate with the OAE and the special master.

As to respondent's disbarment in New York, that discipline was based on his conduct in the *Selby* matter; the thirty-eight matters in which he was sanctioned, criticized or disciplined; and the six-month suspension that we imposed in *DeLuca.* In *Selby*, respondent willfully disobeyed Judge Cote's discovery orders, submitted false statements in affidavits and refused to accept his discharge by the client, even filing an unauthorized appeal on her behalf. Moreover, in his testimony before the special master, respondent represented that, after he filed a motion for reconsideration, Judge Cote entered an order retracting a number of her statements and, notwithstanding her admission that she had misunderstood some issues, had sanctioned his client. In fact, Judge Cote's March 25, 1996 opinion denying respondent's reconsideration motion bears no resemblance to respondent's description of it. The judge did not retract any of her statements and did not admit that she misunderstood some issues. She lifted the sanctions against respondent's client, assessing them solely against respondent. The judge recounted respondent's repeated disobedience of court orders, numerous false misrepresentations to the court and bad faith. As the foregoing demonstrates, respondent made misrepresentations to the special master about Judge Cote's order on his motion for reconsideration.

In ordering disbarment, the New York court considered as aggravating factors (1) respondent's lack of remorse or self-control, (2) his inability to understand the harm that he caused his clients and the courts, (3) the frequency of his misconduct, (4) his continued use of tactics for which he had been previously and repeatedly disciplined and (5) the article in *Lawyer's Weekly USA,* in which he referred to his numerous ethics violations as "chicken-shit stuff."

Although, as noted above, we find that respondent's grievous ethics transgressions, independent of the New York disbarment,

are sufficient to warrant his disbarment, we determined to grant the OAE's motion for reciprocal discipline. Based on *R.* 1:20–14(a), no reason has been presented for us to deviate from the discipline imposed in New York. Although respondent contested the procedural aspects of the New York proceedings, he exhausted all available appeals in that state. Moreover, there was no showing that the misconduct warrants substantially different discipline in New Jersey. In making this determination, we did not consider the prior six-month suspension in *DeLuca* that formed part of the basis for respondent's disbarment in New York. In other words, we find that his wrongdoing in New York, separate and apart from the *DeLuca* violations, was sufficient to warrant reciprocal disbarment.

Respondent's conduct in *Selby* was deplorable. He created chaos by willfully refusing to obey the court's orders and, more egregiously, by lying to the judge. As noted by Judge Cote, respondent submitted false affidavits and made numerous misrepresentations to the court. He also lied to the special master about Judge Cote's findings, falsely contending that, in a subsequent order, she had retracted her findings in this regard. Instead, she confirmed them. The New York court also based its disbarment order on thirty-eight matters in which respondent was sanctioned, criticized or disciplined, and took into consideration his overt disrespect for the courts and for the disciplinary system, as shown by his sophomoric reference to his numerous ethics violations. In short, even without the *DeLuca* matter, we are convinced that respondent's wrongdoing in New York supports his disbarment.

We are forced to conclude that respondent forfeited his privilege to practice law in New Jersey. In 1983, he received a license to practice law in this state. Included in that license was the responsibility to conduct himself in accordance with the professional standards required of New Jersey lawyers. As stated by Justice Benjamin Cardozo, "[m]embership in the bar is a privilege burdened with conditions." *In re Rouss,* 221 *N.Y.* 81, 84, 116 *N.E.* 782 (1917). Respondent has wilfully and repeatedly disregarded

court rules, court orders and the *Rules of Professional Conduct*. He has wilfully and repeatedly displayed egregious disrespect for the courts, his adversaries, the judicial process and the disciplinary system. He has wilfully and repeatedly failed to protect the interests of his clients, at times, refusing to discontinue representation after being discharged by them. He has wilfully and repeatedly engaged in improprieties resulting in thirty-eight instances in which he has been sanctioned, criticized or disciplined, without showing a speck of remorse for his intolerable behavior. Instead, in a legal periodical he minimized the significance of his ethics violations and boasted of his litigation tactics. He is obviously incapable of or unwilling to conform to the requirements of the legal profession.

We have not hesitated to disbar attorneys who have been shown to be ethically bankrupt. *See In re Vincenti, supra*, 152 *N.J.* 253, 704 *A.*2d 927 (1998) (attorney disbarred for his repeated abuses of the judicial process resulting in harm to his clients, adversaries, court personnel and the entire judicial system).

For the protection of the public, as well as for the preservation of the integrity of the bar and the judicial system, respondent must be disbarred. We, thus, unanimously voted to recommend his disbarment. Two members recused themselves. One member did not participate.

We further required respondent to reimburse the Disciplinary Oversight Committee for administrative costs.

*For disbarrment*—PETERSON, MAUDSLEY, BOYLAN, BRODY, LOLLA and WISSINGER, Members—6.

For disqualification—O'SHAUGHNESSY and PASHMAN—2.